**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 23-2204**

―――――――――

WILLIAM D. GLOVER; LINDA K. GLOVER, his wife; RICHARD A. GLOVER; CHRISTY L. GLOVER, his wife; GOSHORN RIDGE, LLC, Individually, and on Behalf of All Others Similarly Situated,

　　　　　Plaintiffs – Appellees,

　　　v.

EQT CORPORATION, a Pennsylvania corporation; EQT PRODUCTION COMPANY, a Pennsylvania corporation; EQT ENERGY, LLC, a Delaware limited liability company,

　　　　　Defendants – Appellants.

―――――――――

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling.  John Preston Bailey, District Judge.  (5:19-cv-00223-JPB-JPM)

―――――――――

Argued:  October 31, 2024　　　　　　　　　　　Decided:  August 20, 2025

―――――――――

Before NIEMEYER, BENJAMIN, and BERNER Circuit Judges.

―――――――――

Affirmed in part and reversed in part by published opinion.  Judge Benjamin wrote the opinion in which Judge Berner joined in full and Judge Niemeyer joined as to Part IV.  Judge Niemeyer wrote an opinion dissenting in part and concurring in part.

―――――――――

**ARGUED:**  Elbert Lin, HUNTON ANDREWS KURTH, LLP, Richmond, Virginia, for Appellants.  Marvin Wayne Masters, MASTERS LAW FIRM, LC, Charleston, West Virginia, for Appellees.  **ON BRIEF:**  David R. Dehoney, New York, New York, Lauren W. Varnado, MICHELMAN & ROBINSON, LLP, Houston, Texas; Jennifer J. Hicks,

30

BABST, CALLAND, CLEMENTS AND ZOMNIR, P.C., Charleston, West Virginia, for Appellants.  Robert P. Fitzsimmons, Mark A. Colantonio, Clayton J. Fitzsimmons, Robert J. Fitzsimmons, Christine Pill Fisher, FITZSIMMONS LAW FIRM PLLC, Wheeling, West Virginia; April D. Ferrebee, MASTERS LAW FIRM, LC, Charleston, West Virginia, for Appellees.

_____

DEANDREA GIST BENJAMIN, Circuit Judge:

This appeal arises from the district court's certification of Plaintiffs'[1] breach of contract and fraudulent concealment claims. The defendants petitioned for permission to appeal the class certification order pursuant to Fed. R. Civ. P. 23(f), and we granted the appeal. We now affirm in part and reverse in part.

## I.

### A.

Plaintiffs own and lease oil, natural gas, and natural gas liquid interests to EQT.[2] Plaintiffs' wells are located across five counties in West Virginia. Plaintiffs' individual leases with EQT number roughly 3,843 (the "Class Leases"). All Class Leases require EQT to pay the lessor royalties. Because EQT expressed its royalty obligation using a variety of form language, textual variations exist amongst the Class Leases.

From January 1, 2012, to February 28, 2021 (the "Class Period"), EQT produced wet gas from all class members' wells. "Wet gas" means gas containing hydrocarbon constituents and natural gas liquids ("NGLs") entrained—meaning "trapped"—within the gas. NGLs include commercially valuable hydrocarbons like propane, butane, and

---

[1] Plaintiffs are William D. Glover, his wife Linda K. Glover, Richard A. Glover, his wife Christy L. Glover, individually, and on behalf of all other similarly situated; and Goshorn Ridge, LLC ("Goshorn").

[2] EQT includes all defendants: EQT Corporation, EQT Production Company, and EQT Energy, LLC.

pentane.  EQT sold Plaintiffs' wet gas at the wellhead[3] to EQT Production Company and EQT Energy.  Despite textual variations in the Class Leases, during the Class Period EQT paid all Plaintiffs royalties based on the British thermal unit ("BTU")[4] content of their wet gas.

EQT next separated the wet gas into "residue gas," composed primarily of methane, and NGLs.  EQT then fractionated the NGLs into separate purity products like butane, propane, pentane, and isobutane.  EQT sold these purity products to unaffiliated third parties.  During the Class Period, EQT did not pay royalties to Plaintiffs for the sales of NGLs or their purity products.

In March 2021, EQT sent a letter to all royalty owners.  EQT stated that "historically" it had calculated royalties based on the "BTU value of natural gas when it is produced."  J.A. 4675 [SEALED].  EQT declared, however, that it "was shifting [its] practice to calculating royalties based on the . . . method of separately valuing the NGLs and the residue gas."  J.A. 4676 [SEALED].

B

Plaintiffs filed this putative class action against EQT and brought claims for breach of contract, statutory interest, and fraudulent concealment.  According to Plaintiffs, under

---

[3] The "wellhead" is the "point where the product first emerges from the ground or literally, the head of the well." *Leggett v. EQT Prod. Co.*, 800 S.E.2d 850, 857 (W. Va. 2017).  By contrast, companies also sell products "downstream of the wellhead, typically at the interstate pipeline." *Id.*

[4] A British thermal unit is "the quantity of heat required to raise the temperature of one pound of water one degree Fahrenheit at a specified temperature." *British thermal unit*, Merriam-Webster.com, https://perma.cc/PNL7-TBTE.

4

the Class Leases, and irrespective of any textual variations, EQT should have paid royalties on its arms-length sales of fractionated NGLs to third parties. Instead, EQT paid royalties on its sale of Plaintiffs' wet gas to EQT Production Company and EQT Energy—entities which were EQT's alter egos. Plaintiffs allege these actions harmed them because fractionated NGLs sold on the open market are more valuable products than wet gas sold by BTU content. During the Class Period, EQT thus underpaid all Plaintiffs. And to hide its scheme, Plaintiffs allege EQT provided Plaintiffs with remittance statements that showed only the production of oil and gas from the lessors' wells but omitted mentioning NGLs.

Plaintiffs sought to certify their claims for: (1) breach of contract and violation of W. Va. Code § 37C-1-3 (statutory interest); and (2) fraudulent concealment.

The district court first granted Plaintiffs' motion for partial summary judgment regarding EQT's alter egos. The district court found that, "from January 1, 2012, to September 6, 2017[] . . . EQT Corporation was the alter ego of the EQT Production Company and EQT Energy and several other subsidiaries." J.A. 4264 (emphasis removed). It also found that from "September 7, 2017, to February 28, 2021 . . . EQT Corporation was and is the alter ego of EQT Production and EQT Energy." J.A. 4270 (emphasis removed). In sum, the district court found that the entities to which EQT sold Plaintiffs' wet gas at the wellhead during the Class Period were EQT Corporation's alter egos.

The district court then granted Plaintiffs' motion for class certification as to both of Plaintiffs' claims. The district court subsequently modified its class certification order to

5

create three subclasses. EQT timely petitioned under Fed. R. Civ. P. 23(f) for permission to appeal the order granting class certification. We granted the appeal.

## II.

We review a district court's decision to certify a class for abuse of discretion. *Brown v. Nucor Corp.*, 576 F.3d 149, 152 (4th Cir. 2009). An error of law or clear error in finding of fact is an abuse of discretion. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006). But short of such error, we give "substantial deference" to a district court's certification decision, recognizing that a "district court possesses greater familiarity and expertise than a court of appeals in managing the practical problems of a class action." *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010).

Federal Rule of Civil Procedure 23(a) requires that the prospective class comply with four prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a). "[T]he class action must [also] fall within one of the three categories enumerated in Rule 23(b)." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). Further, we have recognized that Rule 23 contains an implicit threshold requirement that the proposed class members be "readily identifiable." *See, e.g.*, *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972); *see also In re A.H. Robins Co.*, 880 F.2d 709, 728 (4th Cir. 1989) ("Though not specified in [Rule 23], establishment of a class action implicitly requires . . . that there be an identifiable class . . . ."), *abrogated on other grounds, Amchem Prods., Inc. v. Windsor*, 521 U.S. 591

6

(1997).  This requirement is called "ascertainability."  *See, e.g.*, *Peters v. Aetna Inc.*, 2 F.4th 199, 242 (4th Cir. 2021).

Plaintiffs seek certification under Rule 23(b)(3).  Certification under Rule 23(b)(3) is appropriate when all of the prerequisites of Rule 23(a) are satisfied and two other requirements are met.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011).  Specifically, (1) common questions of law or fact must predominate over any questions affecting only individual class members, and (2) proceeding as a class must be superior to other available methods of litigation.  *See* Fed. R. Civ. P. 23(b)(3).

A party seeking class certification must do more than plead compliance with the above requirements.  *See Wal-Mart*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard.").  Rather, the party must present evidence that the putative class complies with Rule 23.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

It is the plaintiff's burden to demonstrate compliance with Rule 23, but the district court has an independent obligation to perform a "rigorous analysis" to ensure that all the prerequisites have been satisfied.  *See Wal-Mart*, 564 U.S. at 351.  To determine whether the party seeking certification has carried its burden, a district court may need to "probe behind the pleadings before coming to rest on the certification question."  *Comcast*, 569 U.S. at 33 (internal quotation marks omitted).  Although Rule 23 does not give district courts a "license to engage in free-ranging merits inquiries at the certification stage," a court should consider merits questions to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (citing *Wal-Mart*, 564 U.S. at 351 n.6).

7

III.

We first address the district court's certification of Plaintiffs' breach of contract claim. As explained below, the district court did not abuse its discretion by certifying this claim.

A.

According to Plaintiffs, during the Class Period EQT sold itself Plaintiffs' wet gas through alter-egos. EQT paid royalties based on the wet gas' BTU value despite the fact no lease permitted EQT to pay Plaintiffs this way. Plaintiffs contend that per the Class Leases and West Virginia law, EQT should have paid them royalties based on its sales of NGLs to unaffiliated third parties after their wet gas had been fractionated into purity products and brought to market.

The following assumptions undergird Plaintiffs' case: (a) during the Class Period, EQT used the same methodology to pay all Plaintiffs; (b) none of the Class Leases permitted EQT to pay royalties based on the BTU value of the gas produced; (c) variations in the Class Leases' valuation language are immaterial; and (d) absent sufficiently specific contract language to the contrary, West Virginia law defines, by default, a "sale" as the first transaction between non-affiliated parties and requires royalties be paid not only on wet and residue gas, but on the sale of byproducts like NGLs.

To support its class certification motion, Plaintiffs submitted a letter EQT sent to all lessors. Therein, EQT admitted that, "historically, [it] had calculated royalties" by using the "BTU value of [the wet] gas when it is produced." J.A. 4675 [SEALED]. Henceforth,

8

however, EQT stated it would calculate royalties for all lessors "based on separately valuing NGL products and the natural gas that remains after the NGLs are removed." J.A. 4675–76 [SEALED].

Plaintiffs also submitted deposition testimony from EQT's expert, Kris L. Terry. J.A. 4697–4707. Plaintiffs' counsel asked Terry if any of the royalty provisions in over 15 representative lease types allowed EQT to pay royalties based on the BTU value of the wet gas produced at the wellhead. Except for a single lease type—Z1[5]—Terry answered "no." *See* Appellants' Br. at 33 (arguing that even if it were "true [under] all the class leases" that EQT was not permitted to pay royalties based on BTU value, "that would not support the district court's certification decision").

The district court certified Plaintiffs' breach of contract claim.[6] First, based on EQT's May 2021 letter to all lessors, the district court found EQT paid all putative class members based on a single methodology—the BTU content of their wet gas. Then, based on Terry's testimony, the district court found that "no Class Lease[] provide[s] that EQT can pay NGL royalties based upon the BTU value of the NGLs while still entrained in raw wet gas." J.A. 4297–98. Finally, given those two findings, the district court ruled that

---

[5] Z1 leases contain a "market enhancement provision." J.A. 4706. In response to the question of whether Z1 leases allowed EQT to "to pay royalty [sic] based upon the BTU value of the natural gas produced, which is increased by the entrained NGLs," Terry testified that she could not answer without "going through the whole analysis on market enhancement." J.A. 4706. Plaintiffs' counsel responded "Got you. Okay. Fair enough." J.A. 4706.

[6] The district court also certified Plaintiffs' fraudulent concealment claim. We discuss EQT's challenge to this claim in Section IV.

9

variations in the terms of the Class Leases' royalty provisions were immaterial to "the common issue of whether EQT breached its royalty obligations." *See* J.A. 4294; *see also* J.A. 4299 ("In its March 9, 2021 letter, EQT made clear that during the Class Period it made none of the distinctions it now argues to this Court."). Accordingly, the district court certified the following class: "All royalty owners who were paid royalties by EQT between January 1, 2012 and February 28, 2021 pursuant to leases for wells located in West Virginia in Marshall County, Wetzel County, Tyler County, Doddridge County, or Ritchie County which contain [specific lease language] set forth in Exhibit 1." J.A. 4283–84; J.A. 4672–74 [Exhibit 1, SEALED].

A short time later, the district court issued an order creating three subclasses. The first subclass consisted of class members whose leases did not provide for postproduction deductions. The second subclass consisted of class members whose leases did provide for such deductions but did not meet *Tawney*'s requirements for imposing such costs. And the final subclass consisted of class members whose leases provided for payment based on dekatherms.[7] Lease type Z1 is not included within any class.

## B.

In West Virginia, oil and gas leases are "construed liberally in favor of the lessor and strictly against the lessee." *Martin v. Consol. Coal & Oil Corp.*, 133 S.E. 626, 628 (W. Va. 1926). Otherwise, the ordinary principles of contract law govern. *See SWN Prod. Co., LLC v. Kellam*, 875 S.E.2d 216, 227 (W. Va. 2022).

---

[7] A "dekatherm" is one billion BTUs.

10

In *Wellman v. Energy Resources, Inc.*, 557 S.E.2d 254 (W. Va. 2001), the West Virginia Supreme Court of Appeals considered whether lessees (like EQT) could deduct "post-production" expenses from lessors' royalties. Post-production expenses are costs "connected with the operation of an oil and gas lease such as the expense of transporting oil and gas to a point of sale, and the expense of treating or altering the oil and gas so as to put it in a marketable condition." *Id.* at 264. The court answered in the negative and held that, "unless the lease provides otherwise," "if an oil and gas lease provides for a royalty based on proceeds received by the lessee . . . the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale." *Id.* at 265. In doing so, the court adopted an implied duty of marketability rule that required lessees to "get the product to the place of sale in marketable form." *See id.* at 264–65, 274 (quoting *Garman v. Conoco*, 886 P.2d 652, 658 (Colo. 1994)).

Next, in *Estate of Tawney v. Columbia Natural Resources, L.L.C.*, 633 S.E.2d 22 (W. Va. 2006), the court addressed whether lease language stating that royalties were to be calculated "at the wellhead" was sufficient to permit the deduction of post-production costs. *Id.* at 24–25 ("According to CNR, at least 1,382 leases at issue have language indicating that the royalty payment is to be calculated 'at the well,' 'at the wellhead,' 'net all costs beyond the wellhead,' or 'less all taxes, assessments, and adjustments.' "). The court held it was not because the phrasing was ambiguous. *Id*. at 28 ("While the language arguably indicates that the royalty is to be calculated at the well or the gas is to be valued at the well, the language does not indicate *how* or *by what method* the royalty is to be calculated or the gas is to be valued."). And in *SWN Production Co., LLC v. Kellam*, 875

11

S.E.2d 216 (W. Va. 2022), the court confirmed that *Wellman* and *Tawney* were "still good law in West Virginia." *Id.* at 227.

After we held oral argument, the West Virginia Supreme Court of Appeals issued *Romeo v. Antero Resources Corp.*, No. 23-589, __ S.E.2d __, 2025 WL 1650051, (W. Va. June 11, 2025). *Romeo* held that "where an oil and gas lease contains an express or implied duty to market," *Wellman* and *Tawney*'s requirements "extend to the point of sale, not just to the point of marketability or to the first available market." *Id.* at *8. The court clarified "that West Virginia is a 'marketable product rule' state, meaning that unless the lease provides otherwise, royalties may not be calculated based on the value of the oil and gas at a stage where it has not yet been marketed, i.e., sold to a third-party purchaser in an arms-length transaction." *Id.* (citing *Wellman*, 557 S.E.2d at 264). The court further held that "except as may be specifically provided by the parties' agreement, royalties are payable to the mineral owner/lessor not only from the producer/lessee's sale of wet gas and residue gas but also from the lessee's sale of any byproducts of the wet gas such as natural gas liquids." *Id.*; *see also id.* Syl. Pt. 4.

## C.

As a preliminary matter, EQT argues the district court abused its discretion by certifying Plaintiffs' breach of contract claim because neither Plaintiffs' proposed class nor the district court's subclasses are ascertainable.

A class cannot be certified unless it is ascertainable, meaning a court can readily identify the class members in reference to objective criteria. *See Marcus,* 687 F.3d at 593; *see also Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 579–80 (1st Cir. 1986) (finding that a

class failed to satisfy Rule 23 requirements because it would be impossible to identify class members without "individualized fact-finding and litigation").  The plaintiffs need not be able to identify every class member at the time of certification.  But "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate."  *Marcus*, 687 F.3d at 593.

> The district court found Plaintiffs' proposed class was ascertainable:

> [B]ecause EQT made all royalty payments to royalty owners over time pursuant to the Class Leases, EQT possesses the information and ability to reconstruct a Class Lease accounting connecting all royalty payments to owners to Class Leases over time.  By Order dated April 25, 2023, EQT was compelled to provide sworn Interrogatory answers that linked all royalty payments made over time to owners, wells, and Class Leases for the Class Period.  [Doc. 331].  Upon EQT's compliance with this Court's Order, each royalty owner will be objectively identified through the sworn answers of EQT.  Thus, the members of the Class in this case are readily identifiable.

J.A. 4291.

We find no abuse of discretion here.  The district court correctly noted that objective data and criteria exist from which Plaintiffs can connect royalty payments to Class Leases and lessors.  The class-wide data EQT must provide Plaintiffs obviates any concern on this score.  Nevertheless, despite this straightforward conclusion, EQT presents various arguments for why Plaintiffs cannot show ascertainability.

First, EQT argues that because ownership of the Class Leases may have changed overtime, determining who is entitled to royalties is impossible without "extensive and individualized fact finding."  Appellants' Br. at 55.  This argument, however, ignores that the district court required EQT to produce information—"Interrogatory answers that link[]

13

all royalty payments made over time to owners, wells, and Class Leases for the Class Period"—which obviates this problem. So, we dispense with it out of hand.

Second, EQT argues that the subclasses are not ascertainable because of prior litigation. In granting class certification of Plaintiffs' breach of contract claim, the district court excluded all "persons and entities who were members of the class action settlement in *Kay Company, LLC v. EQT Production Company*, 1:13-cv-151 (N.D.W. Va.)." J.A. 3329. EQT argues that there is no "reliable means to identify which of the owners, leases and wells in the[] proposed class are excluded because of their involvement in *Kay Company*." Appellants' Br. at 60. But this contention is belied by EQT's own actions. During discovery, EQT produced royalty accounting data and datasets to Plaintiffs which EQT *itself* represented excluded the *Kay* leases. J.A. 1120 ("Defendants produced updated versions of the two accounting spreadsheets to remove leases in the [*Kay*] settlement class, which were excluded from the new class definition in the Amended Complaint."); *see also Kelly v. RealPage Inc.*, 47 F.4th 202, 224 (3d Cir. 2022) ("[A] straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources."). Accordingly, this argument is likewise a nonstarter.

Last, EQT argues that because determining whether a lease complies with *Tawney* must be undertaken on a case-by-case basis under "the language and history of each lease"—and because there are roughly 3,843 Class Leases—the proposed classes are unascertainable. Appellants' Br. at 59 (citing *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014)) (noting that "[i]f class members are impossible to identify without

14

extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate"). This argument overlooks, however, that Plaintiffs have already identified and grouped all putative Class Leases. And, as explained *infra*, the district court may properly, under West Virginia law, analyze whether a lease complies with *Tawney*. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) ("The goal is not to identify every class member at the time of certification, but to define a class in such a way as to ensure that there will be some administratively feasible way for the court to determine whether a particular individual is a member at some point.") (quoting *Adair*, 764 F.3d at 358) (cleaned up).

Accordingly, we find no abuse of discretion as to ascertainability.

## D.

We now turn to the substance of the district court's class certification order—specifically those sections finding Plaintiffs had demonstrated common questions of law and fact both existed and predominated. The district court observed that EQT "engaged in a common method of calculating its royalty obligations under the Class Leases based upon the BTU value of the raw gas with entrained NGLs and not based upon the higher amount of the price received on the sale of the purity NGL products." J.A. 4294. The district court then rejected EQT's contention that certification was inappropriate because of variations in Class Leases. The district court noted the relevant lease language "relate[d] to the issue of whether EQT was permitted to pay NGL royalties based upon the BTU value in the uniform transaction between [EQT and its alter egos], instead of the proceeds EQT received when the NGLs in their marketable liquid form were sold to third parties." J.A.

15

4303. It then concluded that "[g]iven that EQT treated this issue uniformly in its payment of royalties among all Class Leases, coupled with EQT's expert's admission that there is no language in the Class Leases that allowed EQT to pay royalties for NGLs on a BTU basis, this Court's determination of the issue for one should apply to all, and there is no need to conduct individual lease analysis." J.A. 4303.

We see no abuse of discretion. Based on evidence Plaintiffs put forth, the district court had ample reason to conclude that, given EQT's uniform conduct toward all lessors, the variations in the Class Leases EQT dwelled on did not prevent class certification. This conclusion was apt given EQT's expert's admission that no Class Lease permitted payment for "NGLs on a BTU basis." J.A. 4303. In other words, the district court had reason to find EQT arguably violated all Class Leases uniformly. The district court therefore did not abuse its discretion in finding there were common questions of fact and law and that said questions predominated. EQT's arguments to the contrary do not convince us.

First, EQT argues that our court's decision in *EQT Production Co. v. Adair*, 764 F.3d 347 (4th Cir. 2014), foreclosed class actions premised on "common payment" methods, Appellants' Br. at 42. EQT, however, overreads *Adair* and ignores language contrary to its positions. In *Adair*, proceeding under Virginia law, certain plaintiffs alleged EQT underpaid royalties because of improper deductions and by selling to affiliates in non-arms-length transactions. *See* 764 F.3d at 365. The court observed that the fact "defendants engaged in numerous common [payment] practices *may be sufficient for commonality purposes*." *Id*. at 366 (emphasis added). But the court nuanced that merely engaging in these common practices did not *prove* predominance and remanded because "the district

16

court placed an inordinate emphasis on the sheer number of uniform practices without considering whether those practices are relevant to assessing the defendants' *ultimate liability*." *Id.* (emphasis added); *see also id.* at 352 (faulting the district court's reasoning because it was not "rigorous" enough). Thus, *Adair* does not per se preclude class treatment where a plaintiff alleges a common payment scheme.

By contrast, Plaintiffs have shown how the alleged common payment scheme is central to EQT's liability. Plaintiffs put forward expert testimony that none of the Class Leases permitted EQT to pay royalties based on their wet gas' BTU content. Plaintiffs also put forward evidence—EQT's letter to all lessors—that EQT paid Plaintiffs in just such a way. In sum, Plaintiffs put forth evidence that EQT paid royalties in a manner that violated *every* Class Lease, establishing commonality and typicality.

EQT resists this conclusion by arguing that differences in the Class Leases' language over how and where royalties are calculated preclude finding commonality or typicality. For example, EQT argues that while lease type RRR provides for the "field market price for . . . gas," lease type N1 provides for "proceeds . . . actually received by the working interest owner." Reply Br. at 7. EQT concludes that because these lease types provide for different methods of calculating royalties, Plaintiffs' theory of damages fails.

The district court correctly rejected this argument. True, both provisions use different language to describe valuation ("field market price" versus "proceeds . . . received by the working interest owner"). But these differences are likely immaterial. As noted above, EQT's expert admitted EQT could not pay Plaintiffs' royalties—under *any* lease type—based on the BTU content of their wet gas. Further, both clauses likely

17

suffer from the same defect under *Romeo*—both provisions are *ambiguous* as to what constitutes a "sale." And, under West Virginia law, if not adequately defined, a "sale" must be the transaction between EQT and a "*third-party purchaser in an arms-length transaction*"—sales which include "any byproducts of the wet gas such as natural gas liquids." *Romeo*, 2025 WL 1650051, at *8 (citing *Wellman*, 557 S.E.2d at 264) (emphasis added). Plaintiffs have put forth expert evidence that identifies, for all challenged sales of wet gas, the arms-length transactions from which royalties must be calculated. At bottom, EQT's argument is a red herring, and the district court did not abuse its discretion in rejecting it.

Second, EQT argues that *SWN Production Co., LLC v. Kellam*, 875 S.E.2d 216 (W. Va. 2022), and *Energy Development Corp. v. Moss*, 591 S.E.2d 135 (W. Va. 2003), require factfinders to analyze, on an individualized basis, all ambiguities in oil and gas leases, precluding class treatment. Neither *Kellam* nor *Moss*, however, held as much. Rather, both cases affirm that courts are generally tasked, in the first instance, with interpreting contracts. *See, e.g.*, *Kellam*, 875 S.E.2d at 227–28 ("[W]e believe whether the individual contract sufficiently identifies a method of calculating the deductions is a matter left in the capable hands of *the court* and fact-finder, as appropriate. This is because oil and gas lease agreements are simply contracts and are to be construed as such.") (emphasis added) (citation omitted); *Moss*, 591 S.E.2d at 141 ("[Q]uestions about the meaning of contractual provisions are questions of law.") (quoting *Fraternal Order of Police v. City of Fairmont*, 468 S.E.2d 712, 715 (W. Va. 1996)); Syl. Pt. 6, *Romeo*, 2025 WL 1650051 ("The question

18

as to whether a contract is ambiguous is a question of law to be determined by the court.") (citing Syl. Pt. 5, *Tawney*, 633 S.E.2d at 24).

At most, *Kellam* requires that a factfinder determine the meaning of an ambiguous term for which the parties have submitted conflicting parol evidence. *See* 875 S.E.2d at 220 ("If the parol evidence be not in conflict, the court must construe the writing; but, if it be conflicting on a material point necessary to interpretation of the writing, then the question of its meaning should be left to the jury under proper hypothetical instructions.") (citation omitted) (internal quotation marks omitted).

Here, *Kellam* is inapposite. The district court correctly observed that Plaintiffs did not "admit" the Class Leases contained ambiguities for which parol evidence had to be admitted. Rather, Plaintiffs argued that, even if certain language in the Class Leases was ambiguous as to whether EQT's sale of wet gas to its alter egos constituted a "sale," this language had to "be interpreted against EQT." J.A. 4303; *see Romeo*, 2025 WL 1650051, at *9. And the district court correctly concluded that to the extent the definition of "sale" *was* ambiguous, West Virigina law defined it as a transaction between EQT and a "third-party purchaser in an arms-length transaction." *Romeo*, 2025 WL 1650051, at *8 (citing *Wellman*, 557 S.E.2d at 264); *id.* at *10 (interpreting "the leases at issue" and holding that "[e]ven a cursory review of the leases" showed "that they fail the *Est. of Tawney* test").

In sum, EQT's contentions on this point distort Plaintiffs' arguments and misread pertinent caselaw—neither *Kellam* nor *Moss* preclude class-wide treatment of Plaintiffs' claims.

Third, EQT argues that the district court incorrectly interpreted West Virginia law to hold, under *Estate of Tawney v. Columbia Natural Resources, L.L.C.*, 633 S.E.2d 22 (W. Va. 2006), that unless defined otherwise, a "sale" means a transaction between unaffiliated parties and includes the sale of NGLs. As already noted, however, the West Virginia Supreme Court of Appeals vindicated the district court's interpretation of West Virginia law shortly after we held oral argument: "West Virginia is a 'marketable product rule' state, meaning that unless the lease provides otherwise, royalties may not be calculated based on the value of the oil and gas at a stage where it has not yet been marketed, i.e., *sold to a third-party purchaser in an arms-length transaction.*" *Romeo*, 2025 WL 1650051, at *8 (emphasis added) (citing *Wellman*, 557 S.E.2d at 264 ("[T]he duty to market embraces the responsibility to get the oil or gas in marketable condition and actually transport it to market.")); *id.* (holding that "except as may be specifically provided by the parties' agreement, royalties are payable to the mineral owner/lessor not only from the producer/lessee's sale of wet gas and residue gas but also from the lessee's sale of any byproducts of the wet gas such as natural gas liquids"). The district court's prediction about the default meaning of the term "sale" was spot on—thus, the district court did not err.

Fourth, EQT argues that the district court's clarifying order improperly created atypical subclasses, including a "dekatherm" class and classes based on purported compliance with *Tawney*—compliance which, EQT contends, only a jury can determine. Again, we disagree.

20

As explained above, *Kellam* did not enunciate a per se ban on class-wide treatment of oil and gas leases.  Thus, contrary to EQT's contention, the mere creation of these subclasses did not run afoul of West Virigina law.  Nor was the creation of subclasses for *Tawney*-compliant and noncompliant leases wrong under *Kellam.*  In *Kellam*, a federal district court certified the following question to the West Virginia Supreme Court of Appeals: "What level of specificity does *Tawney* require of an oil and gas lease to permit the deduction of post-production costs from a lessor's royalty payments, and if such deductions are permitted, what costs may be included?"  875 S.E.2d at 227.  The court declined to answer, stating that "these questions can only be answered by looking to the individual lease at issue and other relevant evidence, thus rendering them, in some instances, questions of contract interpretation which we cannot answer."  *Id.*  The court explained that it "c[ould not] create a hard and fast rule . . . insofar as the question is tied directly to the specific language of the lease and, *if ambiguous*, the parties' intent in contracting."  *Id.* (emphasis added).  Read in context, nothing in *Kellam* bars a court from determining whether a lease complies with *Tawney*.  *See id.* at 227–28 (noting the "general rule is that the construction of a writing is for the court") (citing Syl Pt. 1, *Lee Enters., Inc. v. Twentieth Century-Fox Film Corp.*, 303 S.E.2d 702, 703 (W. Va. 1983) (quotation marks omitted)).

At bottom, EQT's argument that a jury must decide whether a lease complies with *Tawney* rests on conflating two types of ambiguities.  On the one hand are ambiguities for which West Virginia law provides default definitions—such as when the term "sale" is unclear in a contract and must be construed against the drafter.  *See Romeo*, 2025 WL

21

1650051, at *9.  On the other hand, where the parties have submitted conflicting parol evidence about the meaning of an ambiguous term for which there is no default rule of interpretation, the factfinder determines its meaning.  *See Kellam*, 875 S.E.2d at 220.  Here, beyond conclusory argumentation, EQT has not shown a factfinder—as opposed to the district court—is required to determine whether the Class Leases comply with *Tawney*.  Thus, EQT's challenge on this basis fails.

Last, we reject EQT's argument that because Goshorn's lease provides royalties are calculated in dekatherms, its claims against EQT are atypical or do not otherwise share common questions of law or fact which predominate over questions affecting only individual class members.  *See* Fed. R. Civ. P. 23.  Goshorn's lease requires EQT to pay royalties based on sales to "third parties."  J.A. 4714.  And Goshorn alleges EQT paid royalties based on sales to its alter-egos even though the lease did not permit as much—the same key question all class members claims pose.  *See Adair*, 764 F.3d at 360 ("[W]hat matters to class certification . . . is the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (alteration adopted) (citing *Wal-Mart*, 564 U.S. at 350).  Accordingly, the fact that Goshorn's royalties are calculated by reference to dekatherms does not render its claim atypical.

At bottom, the district court's certification of Plaintiffs' breach of contract claim was not an abuse of discretion, and we affirm.

E.

We now address the dissent.  To begin, it contends that certification of Plaintiffs' breach of contract claim was improper because the class was not ascertainable.  Diss. Op.

22

at 37–39.  To reach this conclusion, the dissent critiques as "unauthorized" the district court's discovery order requiring EQT to produce information connecting "all royalty payments made over time to owners, wells, and Class Leases for the Class Period." *Id.* at 38; J.A. 4291.  EQT, however, did not appeal this discovery order, and its propriety is not before us.  Thus, the discovery order is not a proper basis on which to hold that Plaintiffs' breach of contract class is not ascertainable.

Next, the dissent contends that we have failed to undertake a "rigorous analysis" of whether Plaintiffs' breach of contract class satisfies Rule 23's requirements.  *See* Diss. Op. at 35–36.  We noted above that:

> The following assumptions undergird Plaintiffs' case: (a) during the Class Period, EQT used the same methodology to pay all Plaintiffs; (b) none of the Class Leases permitted EQT to pay royalties based on the BTU value of the gas produced; (c) variations in the Class Leases' valuation language are immaterial; and (d) absent sufficiently specific contract language to the contrary, West Virginia law defines, by default, a "sale" as the first transaction between non-affiliated parties and requires royalties be paid not only on wet and residue gas, but on the sale of byproducts like NGLs

*Supra* at 8.  The dissent contends that assumptions (b) and (c) are "demonstrably" untrue, while assumption (d) is irrelevant here because the district court did not analyze the " 'specific contract language' " at issue.  *See* Diss. Op. at 35.  We disagree.

Plaintiffs put forth evidence to support their argument that EQT's payment of royalties based on the BTU value of the wet gas produced at the wellhead violated each Class Lease—a fundamental common question.  *See supra* at 9.  Namely, EQT's own expert admitted that none of over 15 representative lease types permitted EQT to pay royalties based on the BTU value of the wet gas produced at the wellhead.  *See* J.A. 4697–

23

4707. And Plaintiffs put forth other evidence—EQT's March 2021 letter to *all lessors*—admitting EQT had previously paid royalties by BTU content, thus violating *all* Class Leases. J.A. 4675 [sealed].

This common question (and common answer) distinguishes the instant matter from the precedent the dissent relies on. *See* Diss. Op. at 30. For example, in *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998), we found class certification inappropriate where the pertinent language in "different contracts" alternatively favored either the plaintiffs' or defendant's respective positions. *See id.* at 340. Commonality and typicality were lacking given the "distinct possibility that there was a breach of contract with some class members, but not with other class members." *Id.* As described above, that is not the case here.

Further, Plaintiffs put forth evidence that the textual variations in the Class Leases' valuation provisions are likely immaterial to the common question of EQT's ultimate liability. EQT's March 2021 letter to *all lessors* declared that it "was shifting [its] practice to calculating royalties based on the . . . method of separately valuing the NGLs and the residue gas." J.A. 4676. Said simply, this letter supports the inference that EQT interprets all Class Leases—or at minimum, their valuation provisions—*identically* and without regard for the very differences which EQT nevertheless claims renders class certification inappropriate. Specifically, if the differences in valuation language amongst the Class Leases *were* material, EQT would presumably not have changed, uniformly, its method of calculating royalties. In finding that common questions both existed and predominated, the district court noted this fact, *see* J.A. 4298–99, 4312–14, a fact which supports finding

24

that common questions both exist and predominate. *Cf. Adair*, 764 F.3d at 360 (first citing and then quoting *Wal-Mart*, 564 U.S. at 360, 350) (noting that "[a] single common question" will suffice to meet Rule 23's commonality requirement where that question's "determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke' ").

Last, and contrary to the dissent's contention otherwise, *see* Diss. Op. at 37, before concluding that any differences in valuation language did not defeat commonality or predominance, the district court *did* analyze specific Class Lease language. The district court "reviewed the numerous exemplar leases submitted by *both* parties." J.A. 4302 (emphasis added). Only then did it find that any "differences" were "distinction[s], [without] a difference" given EQT's common course of conduct toward *all* Class Leases and West Virginia law's requirement that, absent specific language to the contrary, "royalties are to be paid on the price paid by the first non-affiliated buyer." *See* J.A. 4302–03 ("[A]ll relevant Class Lease language, and thus any [relevant] ambiguities therein, relate to the issue of whether EQT was permitted to pay NGL royalties based upon [] BTU value . . . instead of the proceeds EQT received when the NGLs in their marketable liquid form were sold to third parties."); *Adair*, 764 F.3d at 363 ("Neither we nor the district court knows the number of deed variations or the materiality of the discrepant language.").

\* \* \*

Accordingly, for the reasons stated above, we affirm the district court's certification of Plaintiffs' breach of contract claim.

25

IV.

EQT contends that the district court improperly certified a class based on Plaintiffs' fraudulent concealment claim. We agree.

A.

To state a fraud claim under West Virginia law, a party must show "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it." *Lengyel v. Lint*, 280 S.E.2d 66, 69 (W. Va. 1981) (citing *Horton v. Tyree*, 139 S.E. 737, 738 (W. Va. 1927)). Fraudulent concealment "involves the concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud." *Trafalgar House Const., Inc. v. ZMM, Inc.*, 567 S.E.2d 294, 300 (W. Va. 2002) (citation omitted). "[O]ne to whom a representation has been made may believe the same to be true and act thereon without making inquiry or investigation to determine [its] truth . . . ." *Morrison v. Bank of Mount Hope*, 20 S.E.2d 790, 793 (W. Va. 1942). Nevertheless, an exception exists "where there [are] facts and circumstances present when the false representations were made so as to put the injured party upon his guard or to cast suspicion upon their truthfulness." *See id.*

B.

Plaintiffs allege that, during the Class Period, EQT fraudulently concealed the fact it produced NGLs from Plaintiffs' wet gas but never paid royalties on these NGLs. Plaintiffs allege EQT hid its actions from them by omitting all mention of NGLs from

26

remittance statements.    Important here, before the district court Plaintiffs argued certification of this claim was appropriate because each class member's reliance on EQT's allegedly misleading remittance statements could be presumed.    EQT, for its part, disagreed.    It contended that certification of Plaintiffs' fraudulent concealment claim failed under Rule 23 for just this reason—because of the need to inquire into each class member's individual reliance.

The district court certified Plaintiffs' fraudulent concealment claims.    In doing so, it rejected EQT's contention and held that "under West Virginia law, fraudulent concealment does not require a showing of reliance." J.A. 4325.    Certification on this claim was erroneous.

In *Adair*, 764 F.3d at 370, we vacated a district court's certification of fraudulent concealment claims.    We rejected the trial court's assertion that "the doctrine of fraudulent concealment does not focus on the actions or knowledge of the plaintiffs, but [only] on the actions of the defendant." *Id.*    We emphasized that "attention must also be paid to the plaintiff's knowledge and actions," as well as the "defendant's conduct." *Id.*    After observing that "a plaintiff's knowledge typically requires individual evidence, which will frequently defeat Rule 23's requirements," we held that the district court "abused its discretion by failing to give any consideration to what proof the plaintiff-focused elements of the doctrine . . . might require" and we remanded for further proceedings. *Id.*; *see also id.* at 370 n.25 (internal citation omitted).    So too here.

The district court abused its discretion in certifying Plaintiffs' fraudulent concealment claims, as questions affecting only individual class members will predominate

27

over common questions of law or fact.  *See* Fed. R. Civ. P. 23(b)(3).  West Virginia law requires proof of reliance on the defendant's alleged fraudulent acts and considers the individual circumstances under which a plaintiff received and reacted to said acts.  *See Lengyel*, 280 S.E.2d at 69 (requiring a plaintiff to show "he was damaged because he relied upon" the defendant's fraudulent representations); *see also Morrison*, 20 S.E.2d at 793 ("[W]here there [are] facts and circumstances present when the false representations were made so as to put the injured party upon his guard or to cast suspicion upon their truthfulness," the plaintiff cannot show reliance and his claim fails.).

For example, if a putative class member noticed discrepancies in her billing statements from EQT and investigated the inconsistencies, those actions would be relevant to determining whether the class member could establish reliance.[8]  Put differently, "[i]n this case, proof of reasonable reliance . . . depend[s] upon a fact-intensive inquiry into what information each [lessor] actually had," defeating Rule 23(b)(3)'s predominance requirement.  *See Broussard*, 155 F.3d at 342  (reversing certification of fraud and misrepresentation claims under North Carolina law because "these claims turn on whether each franchisee reasonably relied on" the defendant's representations); *see also Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986) (affirming denial of certification of

---

[8] For the very reasons articulated in this hypothetical, the district court granted EQT summary judgment on the named Plaintiffs' fraudulent concealment claim. *See Glover v. EQT Corp.*, No. 5:19-cv-223, 2023 WL 7391871 (N.D.W. Va. Oct. 16, 2023) (granting EQT summary judgment on Glover's fraud claim); *Glover v. EQT Corp.*, No. 5:19-cv-223, 2023 WL 7397486 (N.D.W. Va. Oct. 16, 2023) (granting EQT summary judgment on Goshorn's fraud claim).  These rulings are not challenged on appeal.

fraud claims "[b]ecause the extent of knowledge of the omitted facts or reliance on misrepresented facts will vary from shareholder to shareholder").

* * *

Accordingly, the certification of Plaintiffs' fraudulent concealment claim was an abuse of discretion, and we reverse that portion of the district court's certification order.

V.

For the reasons stated above, we affirm the district court's certification order as to Plaintiffs' breach of contract claim but reverse as to Plaintiffs' fraudulent concealment claim.

*AFFIRMED IN PART AND REVERSED IN PART*

29

NIEMEYER, Circuit Judge, dissenting from Part III and concurring in Part IV:

The majority affirms the district court's certification of a class consisting of the lessors or assigns of some 3,800 leases of oil and gas wells who claim that EQT breached their lease agreements by failing to pay the royalties due. In affirming, however, the majority fails to demand the rigorous analysis that the district court was required to conduct before finding that there are questions of law or fact common to the class and that the representative parties' claims are typical of those of the class, as required by Federal Rule of Civil Procedure 23(a)(2) and (3). The majority also fails to require a rigorous analysis into whether common questions of law or fact *predominate* such that the class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy, as required by Rule 23(b)(3). These failures are especially telling in the circumstances of this case where 70 different types of royalty leases are involved and were entered into at different times and in differing circumstances.

In cases involving far fewer contractual differences among class members, we have indicated that class certification was inappropriate. *See, e.g.*, *EQT Prod. Co. v. Adair*, 764 F.3d 347, 362–63 (4th Cir. 2014); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998). Yet, the majority dances around these binding precedents. It does so by *assuming away* the facts critical for determining commonality, typicality, predominance, and superiority. Before engaging in any analysis, the majority *assumes* that "none of the Class Leases permitted EQT to pay royalties based on the BTU value of the gas produced" and that "variations in the Class Leases' valuation language are immaterial." *Supra* at 8. With those essential circumstances set aside, the majority then approves the

class certification based on only the alleged fact that EQT has adopted a singular method for calculating all royalty obligations to royalty owners.

Because the record shows that there is no one lease form or type of royalty provision common to the plaintiffs' claims, I conclude that under no rational analysis could the proper royalties for each lease be determined on a class basis. And certainly no determination could be made whether EQT breached the lease without assessing each individual lease. The majority simply fails to recognize that the individual claims in this case overwhelm any consideration common to the class.

I would therefore reverse the class certification as to the plaintiffs' contract claims.

I

For many years, EQT and other oil and gas producers entered into leases with landowners to retrieve oil and gas from wells on the landowners' property in exchange for the payment of royalties. As the years passed, the owners often conveyed their interests in the royalties to others, with or without the land. And some producers also conveyed their oil and gas production rights to other entities. The leases entered into varied substantially and in many material respects, such as, among others, how they defined the products for which the producers were to pay royalties, how royalties were to be calculated, and how production costs were to be born. Thus, they were the product of individual needs and negotiations in the context of numerous variables and individualized judgment.

Before selling raw gas, *i.e.*, gas as it is removed at the wellhead, a producer must incur expenses not only for removing the gas, but also for compressing and dehydrating it.

31

The producers generally have an implied duty to bear those expenses *if not otherwise addressed* in the oil and gas leases. Raw gas so treated can then be sold at the wellhead based on (1) the value of the gas in British thermal units (BTUs) measured in dekatherms, (2) a specified market price, or (3) the proceeds that the producer actually receives from the sale of the gas.

Alternatively, because raw gas is entrained with "natural gas liquids" (NGLs), the gas can be refined to extract those liquids for the manufacture of valuable products, such as propane, butane, ethane, isobutane, and pentane. Manufacturing those NGL products generates more income from the gas than what can be obtained from just selling raw gas, but at substantially greater expense. And like the sale of raw gas, the sale of NGLs can be based on a specified market price or on the proceeds that the producer actually receives.

Over the years, producers and royalty owners negotiated leases with widely divergent terms. The district court found that there were 70 different categories of leases employing distinct terms involved in this case. For example, some leases provided for the sale of gas "at the well," or "at the wellhead," or "at the mouth of the well," all of which could be taken to suggest that the lease was providing for the sale of raw gas based either on its BTU value (in dekatherms), the market price, or the proceeds actually received by the producer. Some leases defined "gas" to mean gas in its raw state produced at the well, others defined "gas" with unique language, and others did not define "gas" at all. Some leases provided for a royalty based on a gas "component," while others did not. Some leases also provided for sales downstream from the well to various points in distribution and expressly identified a price or a market value for royalty calculations.

32

The leases also varied regarding lease modifications, including addenda or amendments that struck all or a portion of the original royalty clause; lease language regarding sales made by affiliated entities; and express disclaimers or waivers of implied covenants. Some leases also contained distinct procedural requirements that would relate to any breach of contract claims. For example, many leases that EQT acquired from other oil and gas operators contained notice and cure provisions specifying that the producer could not be deemed in breach of its royalty obligations unless the royalty owner delivered written notice of default and the producer failed to cure the default. Finally, some leases included language informing whether the producer was obligated to make gas marketable and whether it could deduct the cost in doing so.

## II

Five plaintiffs — William Glover and his wife, Linda Glover; Richard Glover and his wife, Christy Glover; and Goshorn Ridge, LLC — commenced this action against EQT Corporation and related companies alleging that EQT fraudulently concealed production information relevant to the determination of proper royalty payments and failed to pay the royalties in the amount required by their leases. They asserted various claims sounding in fraud and breach of contract.

In their complaint, the plaintiffs purported to represent a class of "[a]ll royalty owners who were paid royalties by EQT between January 1, 2012 and February 28, 2021 pursuant to leases for wells located in West Virginia in Marshall County, Wetzel County,

Tyler County, Doddridge County, or Ritchie County which contain the lease language set forth in Exhibit 1." Exhibit 1 provided a list of some 70 different types of leases involved.

On the plaintiffs' motion, the district court certified the class proposed by the plaintiffs as to both the breach of contract claims and the fraud claim. The court recognized there were numerous variations in types of leases involved and differences in the lease language that could arguably preclude a finding of commonality and typicality as to the breach of contract claims. Nonetheless, it disregarded those variations and differences because "during the entire Class Period, EQT treated all Class Leases the same." The court explained:

> EQT utilized a common method of paying [natural gas liquids] royalties to all Class Members irrespective of lease language which constitutes a breach of EQT's common obligation to the Class Members in the same manner. EQT has also consistently failed to pay royalties to Plaintiffs and all other Class Members based upon the prices EQT received on the sale of the natural gas liquids at the point of sale to unaffiliated third parties.

In essence, then, the district court's central justification for certifying a class involving such differing leases was grounded on the allegation that EQT treated them all the same. But the court failed to recognize that breach of contract claims can only be determined by individualized assessment of the leases, looking at the terms of each.

## III

The district court's bypass of all the variations in the leases — even though considering them was essential for determining whether EQT breached the lease agreements — was obvious error. Regardless of EQT's uniform method of calculation, the court would still have to compare EQT's royalty payments with what the leases

34

provided to find a breach, and doing so would require individual assessment of the leases' terms. While the court somehow purported to find that the proposed breach-of-contract class action satisfied the criteria of commonality, typicality, predominance, and superiority, any rigorous analysis would have landed the court directly under the instruction provided by our precedents in *Broussard* and *Adair*, which unmistakably indicate that a class should not have been certified in the circumstances presented.

The majority now perpetuates the district court's error, essentially adopting the district court's conclusion that "variations in the terms of the Class Leases' royalty provisions were immaterial to the common issue of whether EQT breached its royalty obligations." *Supra* at 10 (cleaned up). Indeed, the majority introduces its entire analysis with assumptions that effectively dismiss any consideration of the facts necessary for determining the propriety of class certification. It states:

> The following assumptions undergird Plaintiffs' case: (a) during the Class Period, EQT used the same methodology to pay all Plaintiffs; (b) none of the Class Leases permitted EQT to pay royalties based on the BTU value of the gas produced; (c) variations in the Class Leases' valuation language are immaterial; and (d) absent sufficiently specific contract language to the contrary, West Virginia law defines, by default, a "sale" as the first transaction between non-affiliated parties and requires royalties be paid not only on wet and residue gas, but on the sale of byproducts like [natural gas liquids].

*Supra* at 8.

While the first assumption may be true, the second and third are demonstrably not. And the fourth assumption has no relevance here, where "specific contract language" must be examined. A rigorous analysis of Rule 23's requirements, taking the variations in the leases into account, would inevitably lead to rejection of class certification.

35

To succeed on a motion for class certification, the plaintiffs must first demonstrate satisfaction of the four prerequisites of numerosity, commonality, typicality, and adequacy of representation. *See* Fed. R. Civ. P. 23(a). As we explained in *Broussard*, "The typicality and commonality requirements of the Federal Rules ensure that only those plaintiffs or defendants who can advance *the same factual and legal arguments* may be grouped together as a class." 155 F.3d at 340 (emphasis added) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir. 1997)). In rejecting the *Broussard* plaintiffs' effort to certify a breach-of-contract class, we noted that the plaintiffs "simply [could not] advance a single collective breach of contract action" based on the variations identified there, which were significantly fewer in number and smaller in effect than those here. *Id.*

Yet, the district court here did not follow *Broussard*, nor does the majority now. For example, the majority does not explain how any court could uniformly handle *both* a plaintiff's lease referring to royalties payable on "a sale of the Oil and Gas or its components to a *bona fide* third party purchaser" *and* a lease that makes no mention of the sale of components to third parties but instead provides that the "Lessor shall be paid on the basis of the field market price paid at the wellhead." Similarly, the majority does not explain how a lease *prohibiting* the deduction of expenses for transportation, compression, and other costs can be handled the same as a lease *permitting* the deduction of such costs. When the majority bases its holding on the assumption that the "variations in the Class Leases' valuation language are immaterial," *supra* at 8, it simply assumes away without addressing the essential requirements for demonstrating the appropriateness of a class action for breach of contract claims.

36

The majority also assumes away the full holdings of relevant West Virginia cases by recognizing only their *default* positions and not acknowledging their stated exceptions. For example, to apply *Tawney*, each lease would have to be consulted to determine whether the default holding should apply. *See Est. of Tawney v. Columbia Nat. Res., L.L.C.*, 633 S.E.2d 22, 27–30 (W. Va. 2006) (holding that a party cannot deduct post-production costs *unless the lease provides otherwise*); *see also SWN Prod. Co. v. Kellam*, 875 S.E.2d 216, 221–23 (W. Va. 2022). The majority relies similarly on the decision in *Romeo*, but again it does so without recognizing the exception to its *default* position. *Romeo* specified that presumptions applied but that they *could be negated by individual lease language*, and the *Romeo* court itself proceeded to "examine the leases in question." *Romeo v. Antero Res. Corp.*, No. 23-589, 2025 WL 1650051, at *9–10 (W. Va. June 11, 2025).

At bottom, there is simply no basis in the record to conclude that the plaintiffs satisfied their burden of demonstrating commonality, typicality, predominance, and superiority, and the majority fails to hold the plaintiffs to that necessary burden. When the variations of the leases are recognized, the conclusion must follow that these breach of contract claims can only be disposed of on an individualized basis.

IV

Class certification is inappropriate here also because the plaintiffs have failed to carry their burden of showing that the members of this class are ascertainable, *i.e.*, they are "readily identifiable" using "objective criteria." *Adair*, 764 F.3d at 358 (citations omitted).

37

The plaintiffs admitted that they could not ascertain the members of the class because doing so would require them to link *royalty payments* to *leases* and then to link *leases* to *lessors*.  This is required because lease and royalty ownership has changed over the long relevant period.  While EQT produced during discovery all its relevant documents on the subject, it did not possess any document or record that linked royalty payments to leases and then to lessors, as necessary to ascertain the class members.

Recognizing this inability to satisfy the ascertainability requirement, the plaintiffs submitted a discovery request that EQT *create and produce* "a comprehensive lease, well and lessor cross reference list or table" for the period of some 15 years ("2008 to the present").  EQT objected to the request on several grounds, arguing that it did not have such a document, that rules of discovery did not require it to create documents, and that the creation of such a document would be very time consuming.  Nonetheless, the district court entered an order compelling EQT to create and produce such a document.  The court admitted that it is "typically" true that Federal Rule of Civil Procedure 34 does not require a defendant to create a new document, but it nonetheless compelled EQT to do so on the ground that "this case is not a typical case."  The court rationalized its unprecedented order by positing that EQT was "in a better position than Plaintiffs to organize the information into the format requested," even while acknowledging that the "process is likely to be time consuming."

In so doing, the district court not only issued an unauthorized discovery order, but also improperly shifted the burden of establishing class ascertainability to EQT.  Moreover, the court failed to recognize that the complexity of creating such a document violated the

38

fundamental principles of ascertainability, inasmuch as the time-consuming process required to create the document suggests that the class cannot be ascertained without "extensive and individualized fact-finding or 'mini-trials.'" *Adair*, 764 F.3d at 358 (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).

In view of this undisputed record, I would conclude also that the class should not have been certified as its members were not readily ascertainable.

\*     \*     \*

The majority rushes to affirm a judicial process that will be chaotic and cause unnecessary expense, and in doing so, it blurs what have been clearly established criteria for satisfying the class action requirements. Although the majority would have it otherwise, the class certified here is "no more than a hodgepodge of factually as well as legally different plaintiffs that should not have been cobbled together for trial." *Broussard*, 155 F.3d at 343 (cleaned up). I respectfully dissent.